UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                         Case No. 16-cr-20755

v.                                   Hon. Matthew F. Leitman

ASHANTI WALTON,

      Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE STEMMING FROM SEARCH WARRANT (ECF #14)

On November 15, 2016, a grand jury indicted Defendant Ashanti Walton on a number of firearm and drug offenses. The charges rest in large part upon evidence that law enforcement officers seized when they searched a residence located in Inkster, Michigan. Officers conducted that search pursuant to a warrant issued by a state-court judge.

Walton now moves to suppress the evidence seized during the search on the ground that the affidavit submitted in support of the warrant (1) contained false statements and (2) omitted important facts. (*See* ECF #14.) Walton contends that suppression is warranted under *Franks v. Delaware*, 438 U.S. 154 (1978), because the officer-affiant made the misstatements and omissions with reckless disregard for the truth and because the affidavit, when modified to remove the mis-stated facts

and to include the omitted facts, is insufficient to establish probable cause to search the residence. (*See id.*)

The Court declines to suppress the evidence. As explained below, even if the affidavit were modified pursuant to *Franks*, the affidavit would still establish that on the same day that the officer-affiant sought the warrant, a person exited the residence, engaged in a drug transaction in the driveway, and re-entered the residence. Under controlling Sixth Circuit precedent, those facts alone are enough to establish probable cause to search the residence. *See United States v. Ellison*, 632 F.3d 347 (6th Cir. 2011). Accordingly, Walton's Motion to Suppress is **DENIED**.

## I

## A

On October 17, 2016, Detective Carl Mack of the Western Wayne Narcotics Team (the "WWNT") received a tip from a paid confidential informant that two black males were driving around the City of Inkster in a burgundy Ford Explorer attempting to sell crack cocaine. (*See* 6/20/2017 Hearing Tr., ECF #21 at Pg. ID 158.) Detective Mack relayed the tip to Detective Brian Zinser. (*See id.*)

Later that afternoon, Detective Zinser located the Ford Explorer parked in the driveway of a home located at 26842 Hopkins Street in the City of Inkster (the "Hopkins Residence"). (*See* 9/12/2017 Hearing Tr., ECF #22 at Pg. ID 283-84, 286-87.) Detective Zinser then began conducting surveillance of the residence. (*See id.*

at Pg. ID 287.) Detective Zinser observed a maroon Ford pick-up truck pull into the driveway of the Hopkins Residence, and he saw a person walk from the residence to the driver's side of the truck. (*See id.* at Pg. ID 291-292.) The person spent about thirty seconds at the side of the truck and then returned to the house, and the truck drove away. (*See id.*) Detective Zinser could not see the interaction between the person from the house and the driver of the truck because Zinser was positioned on the opposite side of the truck. (*See id.* at Pg. ID 293-94.) But based upon his experience, he suspected that the two individuals engaged in a drug transaction.

WWNT Sergeant Paul Calleja, who was also involved in the investigation arising out of the tip, then directed Michigan State Trooper Robe to stop the maroon truck, and Trooper Robe did so. (*See id.* at Pg. ID 331.) Officers from the WWNT joined State Trooper Robe during the stop. (*See id.* at Pg. ID 331-32.)

The driver of the truck initially denied any wrongdoing, but then admitted that he had crack cocaine in the truck's center console. (*See id.* at Pg. ID 333.) Officers thereafter retrieved a baggie from the console, tested its contents, and verified that the baggie contained cocaine. (*See id.* at Pg. ID 334.) The officers then arrested the driver and took him to a police station. (*See id.* at Pg. ID 335-36.) During a post-*Miranda* interview, the driver admitted that he had purchased $100 of crack cocaine at the Hopkins Residence earlier in the day. (*See id.* at Pg. ID 305.) The driver

added that on four prior occasions, he had purchased crack cocaine at the Hopkins

Residence from a man named Russ who lived there. (*See id.* at Pg. ID 304.)

Later that day, Detective Mack asked Judge Mark Somers of the 19th District

Court for the State of Michigan to issue a search warrant for the Hopkins Residence.

In support of the warrant request, Detective Mack submitted an affidavit (the "Mack

Affidavit") in which he stated, among other things, that:

> 6) On 10/17/2016, [the Confidential Informant] contacted your Affiant advising that on today's date a burgundy Ford Explorer bearing MI Reg: 3LSZ82 driving around the City of Inkster occupied by two black males in their 30's.
>
>> a. Further, [the Confidential Informant] stated that the occupants offered a quantity of crack cocaine to the [Confidential Informant] and showed him/her a bag which contained what the [Confidential Informant] believed to be crack cocaine.
>>
>> b. Further your Affiant completed a license plate query on MI Reg:3LSZ82. The query identified the vehicle as being a 2006 Ford Explorer registered to Louise Russell at [the Hopkins Residence].
>
> 7) On 10/17/2016, at approximately 1630 hours, Detectives with Western Wayne Narcotics established surveillance at [the Hopkins Residence]. Upon establishing surveillance Det. Zinser observed the aforementioned Ford Explorer and a teal Dodge Charger bearing MI Reg: LULU4 parked in the driveway of the residence.

a. Further, Det. Zinser completed a license plate query on MI Reg: LULU4 which is registered to Ashanti Kamu Walton (DOB: [Date of Birth Redacted]).

b. Further at approxminatley [sic] 1830 hours Det Zinser observed a maroon Ford Pick Up Truck Bearing MI Reg: DEE3203 arrive at the residence and an unknown individual exit the residence and approach the drivers door of the aforementioned vehicle. A short time after approaching the vehicle, the individual walked away from the vehicle and entered the residence. The vehicle then left the area.

i. Based on your Affiants [sic] training and experience, this type of short term contact is consistant [sic] with the sale of narcotics.

8) On 10/17/2016, at approximately 1815 hours MSP K-9 Officer Robe initated [sic] a traffic stop on the aforementioned pick up truck for several traffic violations. D/Sgt. Calleja arrive on scene shortly after to assist.  The driver was identified as [the Driver] and was the lone occupant.

a. During the course of the investigation, D/Sgt. Calleja asked [the Driver] were [sic] the crack he had was located inside the vehicle. [The Driver] stated that the crack was located in the center console of his vehicle and request to grab it for officers. [The Driver] was allowed to retrieve the crack which was located in a white baggie within the center console.

b. [The Driver] was transported to the Canton Police Department pending further investigation and interview.

c. Further, your Affiant completed a field test of the suspected crack cocaine. The field test showed a positive indication for the presence of cocaine.

9) On 10/17/2016, during a post Miranda interview of [the Driver] conducted by Det. Zinser, [the Driver] stated that on today's date he purchased $100.00 of crack cocaine from an unknown individual from [the Hopkins Residence].

a. Further, [the Driver] stated that he has purchased crack cocaine from an unknown black male whom he only knows as "Russ" and is approximately 35 years old. [The Driver] stated that "Russ" resides at [the Hopkins Residence] and has purchased crack cocaine from him at the residence the past four times.

b. Further, [the Driver] stated that the black male has also been seen utilizing the aforementioned Ford Explorer bearing MI Reg: 3LSZ82.

c. Further, Det. Zinser utilized a MIDRS photograph of Ashanti Walton and provided it to [the Driver]. [The Driver] identified Walton as the individual whom he purchased the crack cocaine from.

10) Your Affiant believes, based on above listed facts, that there will be illegal narcotics, paraphernalia, packaging supplies, money, documents, and receipts located at [the Hopkins Residence], and that this search warrant is essential for the completion of this investigation.

(Mack Aff., ECF #14-1 at Pg. ID 68-69.)

Judge Somers issued a search warrant for the Hopkins Residence the same night Detective Mack presented it to him (*see* Search Warrant, ECF #14-1 at Pg. ID

75-76), and officers from the WWNT immediately executed it. During the search, the officers found drugs, drug paraphernalia, multiple firearms and other weapons, and body armor. (*See* Criminal Compl., ECF #1.)

**B**

On November 15, 2016, a grand jury indicted Walton on three offenses: possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1); felon in possession of firearms in violation of 18 U.S.C. § 922(g); and possession of firearms in furtherance of drug trafficking crime in violation of 18 U.S.C § 924(c). (*See* ECF #8.)

On February 6, 2017, Walton filed a motion for a *Franks* hearing and to suppress the evidence seized from the Hopkins Residence (the "Motion to Suppress"). (*See* ECF #14.) The Court granted Walton's request for a *Franks* hearing. (*See* ECF #18.) The Court held an evidentiary hearing on June 20, 2017, and continued the hearing on September 12, 2017. Detective Mack, Detective Zinser, Sergeant Calleja, and Judge Somers testified at the hearing.

In a post-hearing supplemental brief, Walton argues that the Mack Affidavit contains numerous misstatements and omissions and that Detective Mack made them with reckless disregard for the truth. (*See* Walton's Post-Hearing Supp. Br., ECF #24 at Pg. ID 415-23.) Walton contends that the Court should strike the misstatements and read the omissions into the Mack Affidavit, and he insists that

once the affidavit is corrected in that manner, it no longer establishes probable cause to search the Hopkins Residence. (*See id.* at Pg. ID 423-26.)

## II

## A

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Whether the required probable cause exists depends upon the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238.

When a defendant challenges the sufficiency of an affidavit submitted in support of a search warrant, "the duty of a reviewing court is simply to ensure that the [issuing judge] had a substantial basis for ... conclud[ing] that probable cause existed." *Id*. (quotations omitted). "The affidavit should be reviewed in a commonsense- rather than a hypertechnical-manner, and the court should consider

whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). Finally, "[t]he [issuing judge's] determination of probable cause is afforded great deference, and that determination should be reversed only if the magistrate arbitrarily exercised his discretion." *Id.*

But what should a reviewing court do when a defendant presents evidence that law enforcement officers misled a judicial officer into issuing a warrant by making false statements in, or omitting important information from, a search warrant affidavit? *Franks* answers that question. Under *Franks*, a reviewing court "must strike from the warrant affidavit statements that the defendant can prove by a preponderance of the evidence to be both (a) materially false and (b) made with reckless or intentional disregard for their falsity." *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002) (citations omitted). "If the redacted affidavit, purged of recklessly and materially false statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid." *Id.* (footnote omitted). Likewise, if a defendant proves by a preponderance of the evidence that an affidavit contains material omissions made with reckless disregard for the truth, a court must "analyze the affidavit 'including the omitted portions and determine whether probable cause still exists.'" *United States v. West*, 520 F.3d 604, 611 (6th Cir. 2008) (quoting *United States v. Atkin,* 107 F.3d 1213, 1217 (6th Cir.1997)).

# B

## 1

Walton contends that the Mack Affidavit is tainted by material misstatements and omissions. He first identifies the following allegedly false statements:

1. The affidavit states that "a teal Dodge Charger bearing MI Reg. LULU4" was parked in the Hopkins Residence driveway and that the LULU4 plate "was registered to Ashanti Walton." (Mack Aff. at ¶¶ 7, 7a, ECF #14-1 at Pg. ID 68.) Walton has presented evidence (and the Government has stipulated) that the Charger did not bear the LULU4 plate and that that plate was not registered to Walton. (*See* 6/20/2017 Hearing Tr., ECF #21 at Pg. ID 151.)

2. The affidavit states that State Trooper Robe stopped the maroon pick-up truck (observed by Detective Zinser in the driveway of the Hopkins Residence) "for several traffic violations." (Mack Aff. at ¶8, ECF #14-1 at Pg. ID 68.) Walton argues that this statement is false because Sergeant Calleja testified that he directed State Trooper Robe to conduct an "investigatory drug stop" on the maroon pick-up truck after it left the Hopkins Residence. (9/12/2017 Hearing Tr., ECF #22 at Pg. ID 331.)

Walton then highlights the following facts, revealed during the evidentiary hearing before the Court, that Mack omitted from his affidavit:

1. The individual who provided the initial tip about individuals attempting to sell crack cocaine from the Ford Explorer was a paid informant. (*See* Def's Post-Hearing Supp. Br., ECF #24 at Pg. ID 420-21; 9/12/2017 Hearing Tr., ECF #22 at Pg. ID 341-42.)

2. The driver of the maroon pick-up truck initially lied about the reason for his visit to the Hopkins Residence. (*See* Walton's Post-Hearing Supp. Br., ECF #24 at Pg. ID 419-20; 6/20/2017 Hearing Tr., ECF #22 at Pg. ID 219-21.) Before confessing that he had visited the residence to buy crack cocaine, the driver first told police that he stopped in order to drop off a friend and next told police that he stopped to purchase medical marijuana from the residence. (*See id.*)

3. A woman named Louise Russell, not Walton, was listed as the registered owner of the Hopkins Residence. (*See* Walton's Post-Hearing Supp. Br., ECF #24 at Pg. ID 422; 9/12/2017 Hearing Tr., ECF #22 at Pg. ID 310.)

4. During Detective Zinser's surveillance of the Hopkins Residence, Zinser saw a female, not Walton, drive the Dodge Charger away from, and then back to, the Hopkins Residence. (*See* Walton's Post-Hearing Supp. Br., ECF #24 at Pg. ID 422; 9/12/2017 Hearing Tr., ECF #22 at Pg. ID 290.)

Walton contends that Detective Mack acted with a reckless disregard for the truth when he made the misstatements and omissions identified above.[1] Walton argues that the following circumstances, taken together, demonstrate Detective Mack's recklessness: (1) neither Detective Mack nor Detective Zinser could provide a coherent and consistent explanation concerning how and why Mack stated in his affidavit that the Dodge Charger bore license plate LULU4 and that the plate was registered to Walton; (2) Detective Mack did not follow the WWNT's usual practice of having other officers review the affidavit for accuracy; (3) Detective Mack never attempted to verify any of the information provided to him by Detective Zinser; and (4) the Mack Affidavit contains obvious errors that would have been caught if

---

[1] Walton argues that Detective Zinser and Sergeant Calleja also acted with a reckless disregard for the truth and that they caused (at least in part) some of the false statements and/or omissions in the Mack Affidavit identified above. Their alleged misconduct is relevant here because "[t]he *Franks* analysis applies not only to the affiant but must extend also to government and police officers who furnish erroneous information to the affiant as well." *United States v. Delgado*, 121 F. Supp. 2d 631, 641 (E.D. Mich. 2000). However, for ease of reference, and because the Court's ruling does not depend on which officer acted with a reckless disregard for the truth, the Court will refer to the identified misstatements and omissions as made by "Detective Mack" with reckless disregard for the truth.

Detective Mack had actually made an effort to ensure the accuracy of his statements.[2]

**2**

The insurmountable problem for Walton is that even if he is correct – *i.e.*, even if Detective Mack made the alleged misstatements and omissions identified above and did so with reckless disregard for the truth – suppression of the evidence would not be warranted.[3]  That is because the Mack Affidavit, even if it were

---

[2] For instance, the Mack Affidavit states that Detective Zinser observed the suspected drug transaction in the driveway of the Hopkins Residence at 18:30 and that State Trooper Robe stopped the maroon pick-up truck that participated in that transaction at 18:15.  (*See* Mack Aff. at ¶¶ 7b, 8, ECF #14-1 at Pg. ID 68.)  As Detective Mack conceded during his hearing testimony, those times are obviously wrong because the observation of the suspected drug deal had to happen *before* the stop based upon that observation. (*See* 6/20/2017 Hearing Tr., ECF #21 at Pg. ID 160-61.)  Walton contends – not unreasonably – that even a cursory review of Mack Affidavit should have revealed this error.  The Court notes that even though the Mack Affidavit listed incorrect exact times for the suspected drug deal and later traffic stop, Judge Somers could reasonably have concluded, based upon a commonsense review of the entire affidavit, that the stop occurred after Detective Zinser witnessed the suspected drug deal.

[3] As noted above, for purposes of this ruling, the Court is willing to assume that the misstatements in the Mack Affidavit identified by Walton were, in fact, false statements.  However, the Court is not necessarily convinced that the statement in the affidavit that State Trooper Robe stopped the maroon pick-up truck "for several traffic violations" is false.  Walton plausibly argues that the statement is false because Sergeant Calleja testified that he gave the order for State Trooper Robe to stop the truck and he told Robe to conduct an "investigatory drug stop." (9/12/2017 Hearing Tr., ECF #22 at Pg. ID 331.)  But the fact that Sergeant Calleja told State Trooper Robe to stop the truck to investigate a drug offense does not compel the conclusion that Robe stopped the truck for that purpose.  It is possible that after Sergeant Calleja gave his instructions, State Trooper Robe saw the driver of the truck

modified pursuant to *Franks*, would still establish probable cause to believe that evidence of a crime would be found in the Hopkins Residence.

If the alleged misstatements were eliminated from the Mack Affidavit and the omitted facts were added back in, the affidavit would provide in relevant part that (in red-line format to clearly show the eliminations and additions):

> 6) On 10/17/2016, [the Confidential Informant] contacted your Affiant advising that on today's date a burgundy Ford Explorer bearing MI Reg: 3LSZ82 driving around the City of Inkster occupied by two black males in their 30's.
>
>> a. Further, [the Confidential Informant] stated that the occupants offered a quantity of crack cocaine to the [Confidential Informant] and showed him/her a bag which contained what the [Confidential Informant] believed to be crack cocaine.
>>
>> b. The Confidential Informant received payment for the information that he/she provided.
>>
>> b.c. Further your Affiant completed a licence [sic] plate query on MI Reg:3LSZ82. The query identified the vehicle as being a 2006 Ford

---

commit traffic infractions and that Robe stopped the truck for that reason. Detective Mack testified that State Trooper Robe said that he (Robe) conducted the stop based upon traffic violations. (*See* 6/20/2017 Hearing Tr., ECF #21 at Pg. ID 214.) Walton did not call State Trooper Robe as a witness, and without testimony from Robe, there is some uncertainty on this record as to the true basis for the stop by Robe. Nonetheless, for the purpose of the analysis above, the Court has assumed that State Trooper Robe stopped the truck as a part of a drug investigation, not based upon traffic infractions.

Explorer registered to Louise Russell at [the Hopkins Residence].

d. A search of records relating to the Hopkins Residence identified Louise Russell, a female, as owner of the home.

7) On 10/17/2016, at approximately 1630 hours, Detectives with Western Wayne Narcotics established surveillance at [the Hopkins Residence]. Upon establishing surveillance Det. Zinser observed the aforementioned Ford Explorer and a teal Dodge Charger bearing MI Reg: LULU4 parked in the driveway of the residence.

a. Further, Det. Zinser completed a licence [sic] plate query on MI Reg: LULU4 which is registered to Ashanti Kamu Walton (DOB: [Date of Birth Redacted]).

a. During surveillance, Det. Zinser observed a female enter the Dodge Charger and drive away. The female later returned in the Dodge Charger.

b. Further at approxminatley [sic] 1830 hours Det Zinser observed a maroon Ford Pick Up Truck Bearing MI Reg: DEE3203 arrive at the residence and an unknown individual exit the residence and approach the drivers door of the aforementioned vehicle. A short time after approaching the vehicle, the individual walked away from the vehicle and entered the residence. The vehicle then left the area.

i. Based on your Affiants [sic] training and experience, this type of short term contact is consistant [sic] with the sale of narcotics.

8) On 10/17/2016, at approximately 1815 hours MSP K-9 Officer Robe initated [sic] a~~n~~ investigatory drug ~~traffic~~ stop on the aforementioned pick up truck ~~for several traffic violations~~. D/Sgt. Calleja arrive on scene shortly after to assist. The driver was identified as [the Driver] and was the lone occupant.

    a. When first questioned at the scene of the stop, the Driver claimed that he was dropping off a friend at the Hopkins Residence. The Driver next claimed that he stopped at the Hopkins Residence to purchase medical marijuana.

    b. During the course of the investigation, D/Sgt. Calleja continued to ask~~ed~~ [the Driver] were [sic] the crack he had was located inside the vehicle. [The Driver] stated that the crack was located in the center console of his vehicle and request to grab it for officers. [The Driver] was allowed to retrieve the crack which was located in a white baggie within the center console.

    ~~b.~~c. [The Driver] was transported to the Canton Police Department pending further investigation and interview.

    ~~c.~~d. Further, your Affiant completed a field test of the suspected crack cocaine. The field test showed a positive indication for the presence of cocaine.

9) On 10/17/2016, during a post Miranda interview of [the Driver] conducted by Det. Zinser, [the Driver] stated that on today's date he purchased $100.00 of crack cocaine from an unknown individual from [the Hopkins Residence].

    a. Further, [the Driver] stated that he has purchased crack cocaine from an unknown black male whom he only knows as "Russ" and is approximately 35 years old. [The Driver] stated that "Russ" resides

at [the Hopkins Residence] and has purchased crack cocaine from him at the residence the past four times.

b. Further, [the Driver] stated that the black male has also been seen utilizing the aforementioned Ford Explorer bearing MI Reg: 3LSZ82.

c. Further, Det. Zinser utilized a MIDRS photograph of Ashanti Walton and provided it to [the Driver]. [The Driver] identified Walton as the individual whom he purchased the crack cocaine from.

10) Your Affiant believes, based on above listed facts, that there will be illegal narcotics, paraphernalia, packaging supplies, money, documents, and receipts located at [the Hopkins Residence], and that this search warrant is essential for the completion of this investigation.

This modified affidavit, when read in a "commonsense" fashion, indicates that:

- Detective Zinser found in the driveway of the Hopkins Residence the same Ford Explorer that was reportedly involved in an effort to sell crack cocaine earlier in the day (*see* Modified Mack Aff. at ¶7);

- Detective Zinser saw a person exit the Hopkins Residence and briefly engage with the driver of the maroon pick-up truck in the driveway of the residence (*see id.* at ¶7(b));

- following the interaction the person who had exited the residence re-entered the residence (*see id.*);

- the brief interaction in the driveway was consistent with a drug transaction (*see id.* at ¶7(b)(i));

- a stop and search of the maroon pick-up truck shortly after it left the driveway of the residence revealed crack cocaine in the console of the vehicle (*see id.* at ¶¶ 8(a)-(d)); and

- the driver of the pick-up truck admitted that he had purchased crack cocaine from the Hopkins Residence that same day. (*See id.* at ¶9.)

These facts are sufficient to support a reasonable belief that an occupant of the Hopkins Residence exited the residence and engaged in a drug transaction with the driver of the maroon truck in the driveway of the residence. That drug deal (along with Mack's statement in his affidavit that drug sellers often keep their wares in places over which they have dominion or control or to which they have ready access) established probable cause to search the residence. *See United States v. Ellison*, 632 F.3d 347 (6th Cir. 2011).

In *Ellison*, state law enforcement officers sought a warrant to search a residence. In support of their request, they submitted an affidavit that described a driveway drug deal involving an occupant of the residence:

> The [confidential informant] observed "Short" exit a side door of the residence and meet with "Red". While standing outside, "Short" did give "Red" a large quantity of cocaine in a plastic bag. After the deal was completed "Short" went backing [sic] into the residence and "Red" left the property.

*Id.* at 348. The officer-affiant added that, in his experience, "persons present at locations where illegal narcotics are sold and/or used often have contraband, narcotics paraphernalia, weapons, or other evidence of criminal conduct hidden on

their persons or in their belongings…." *Id.*[4]  Based upon the affidavit, a state-court judge issued a warrant to search the residence.  In a subsequent federal prosecution that arose out of the search, the district court held that the affidavit established probable cause to search the house and denied a motion to suppress the evidence seized during the search.

The Sixth Circuit agreed that the affidavit established probable cause to search the residence:

> Probable cause existed for the search of Ellison's residence and Ellison's person because the warrant affidavit established a nexus between the place to be searched and the evidence sought. Commission of a drug transaction outside of a house and one participant's walking back into the house, as observed in this case, plainly demonstrated a sufficient nexus with the house.
>
> The affidavit explained that a confidential informant had observed someone come out of Ellison's residence, engage in a drug transaction, and then return into the residence. These incriminating actions are inextricably connected to the residence for which the search warrant was sought. From these actions, the affiant and the issuing judge could infer that there was a fair probability that drugs were being stored in the residence or that drug trafficking was taking place from the residence, such that a search of the residence would be likely to yield contraband or evidence

---

[4] Like the affidavit in *Ellison*, the Mack Affidavit provided that "[b]ased on your Affiant's training and experience he knows that the items described in paragraphs 4a through 4k [such as cash, firearms, books and records, and electronic equipment used in drug trafficking] are commonly kept in places where the drug trafficker has dominion and control, where they have ready access to and at places where they reside." (Mack Aff. at ¶5, ECF #14-1 at Pg. ID 68.)

> of a crime. This showing of a fair probability is all that is
> required to justify the issuance of a search warrant.

*Id.* at 349.

The driveway drug deal described in the *Ellison* affidavit is not distinguishable in any meaningful way from the driveway drug deal depicted in the modified Mack Affidavit set forth above. Since the affidavit in *Ellison* established probable cause to search the house, the Court is compelled to hold that the Mack Affidavit, as modified, would have been sufficient to establish probable cause to search the Hopkins Residence.[5] Therefore, there is no basis under *Franks* to suppress the evidence seized from the residence.

**3**

Walton insists that the Mack Affidavit, as modified to reflect the additions and deletions identified above, would not have established probable cause to search

---

[5] Indeed, the Mack Affidavit, as modified, is stronger than the affidavit deemed sufficient to establish probable cause in *Ellison*. The affidavit in *Ellison* did not indicate that there was a history of drug dealing at the residence in question. *See Ellison*, 632 F.3d at 349. The Mack Affidavit, as modified, states that an individual who resided at the Hopkins Residence sold drugs from the residence on four prior occasions. (*See* Mack Aff. at ¶9a, ECF #14-1 at Pg. ID 69.) The link between that drug seller and the residence further supports probable cause to search the residence. *See United States v. White*, 874 F.3d 490, 501 (6th Cir. 2017) (recognizing that "there is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home").

the Hopkins Residence. The Court disagrees. The Court addresses Walton's arguments concerning each addition and deletion below.

Walton first focuses on the deletion of the statements connecting him to license plate LULU4 and to the Dodge Charger in the driveway of the Hopkins Residence. Walton says that these false statements were essential to Judge Somers' finding of probable cause because they were "the only real connecting fact[s] between [himself] and the Hopkins residence…." (Walton's Post-Hearing Supp. Br., ECF #24 at Pg. ID 418.) However, probable cause to search the Hopkins Residence did not hinge upon Walton's alleged connection to the residence. Instead, as *Ellison* makes clear, probable cause existed based upon the driveway drug deal. Thus, deleting the references in the Mack Affidavit to license plate LULU4 and its registration to Walton – and thereby weakening the link between Walton and the Hopkins Residence – would not have negated the probable cause established by the affidavit.

Walton next turns to the addition of the fact that the driver of the maroon pick-up truck initially lied to police about why he visited the Hopkins Residence. Walton argues that including the driver's false statements in the Mack Affidavit would have "undermined … the full truth of the matter[s]" addressed in the affidavit. (*Id.* at Pg. ID 419.) The Court does not share that view. The Court does not believe that the truck driver's initial false statements here materially undermine the veracity of his

later confession that he did, in fact, engage in a drug deal at the Hopkins Residence. Indeed, it does not strike the Court as terribly unusual that a driver stopped on suspicion of drugs would initially deny any culpability and offer a false exculpatory explanation and then truthfully admit his guilt only after recognizing that the "jig is up."[6]  Moreover, the Mack Affidavit explained that the WWNT officers verified important aspects of the driver's confession: they saw him stop briefly in the driveway of the Hopkins Residence and shortly thereafter found a baggie of cocaine in his truck.  Under these circumstances, the Mack Affidavit would have established probable cause even if it had included the initial false exculpatory statements by the driver of the maroon pick-up truck.

Walton next addresses the change to the Mack Affidavit reflecting that State Trooper Robe stopped the driver of the maroon pick-up truck for an "investigatory drug stop" rather than for "traffic violations."  Walton asserts that this change would have led Judge Somers to conclude that the stop of the maroon pick-up truck was unlawful because it was not supported by a reasonable suspicion that the driver had committed a drug offense.  (*Id.* at Pg. ID 420.)  Walton then contends that if Judge Somers had determined that the stop of the truck was illegal, he would have excluded

---

[6] Sergeant Calleja's testimony supports this observation.  Sergeant Calleja testified that at the stop of the maroon pick-up truck, "[the Driver] did not tell the truth until I confronted him on what the truth was and what I knew, which is very common for people who are being investigated." (9/12/2017 Hearing Tr., ECF #22 at Pg. ID 335.)

from his probable cause analysis the fact that officers found crack cocaine in the maroon pick-up truck. (*See id.*)  Walton finally implies if Judge Somers had not considered the crack cocaine found in the truck, he would not have found probable cause to search the Hopkins Residence and would have refused to sign the search warrant. (*See id.*)

This line of argument rests on the assumption that Judge Somers would have or should have independently analyzed the legality of the stop of the maroon pick-up truck.  But Walton has not presented any evidence that Judge Somers customarily analyzed whether police lawfully seized evidence mentioned in search warrant affidavits presented to him, nor has Walton cited any cases holding that a judicial officer should do so at the warrant-issuing stage.[7]  Moreover, Walton has not established that Judge Somers would have refused to consider the evidence seized

---

[7] Notably, some courts have explained that "it is *not* the [issuing judge's] function … to determine whether the facts alleged in the affidavit were lawfully obtained," *People v. Cook*, 583 P.2d 130, 145 (Cal. 1978) (emphasis added).  At least one federal court has rejected the argument that a warrant-issuing magistrate should assess the legality of the police conduct described in an affidavit because it "misconstrues the function of magistrates in issuing search warrants." *United States v. Edwards*, 443 F.Supp. 192, 197 (D. Mass. 1977), *aff'd* 602 F.2d 458 (1st Cir. 1979).  That function, according to the court, "is to determine whether the government presented sufficient evidence to establish probable cause for issuance of a warrant … not to decide whether the evidence was obtained by constitutional means.  Such decisions are reserved for trial courts at motions to suppress." *Id*.  *See also Everhart v. State*, 337 A.2d 100, 113 (Md. 1975) (holding that "the warrant issuing magistrate is not required to raise *sua sponte*, possible constitutional problems which might appear on the face" of a search warrant affidavit).

from the driver of the maroon pick-up truck even if the judge had determined that there was no basis for an "investigatory drug stop" of the truck.[8]  Accordingly, Walton has not demonstrated that Judge Somers would have declined to issue the warrant for the Hopkins Residence if the Mack Affidavit had stated that officers conducted an "investigatory drug stop" on the maroon pick-up truck.

Next, Walton highlights the addition of the fact that the source of the original tip in the investigation – the tip that two men in a Ford Explorer were attempting to sell crack cocaine – was a paid informant.  Walton argues that if "Judge Somers [had] known that the informant was being paid, he certainly would have wanted more informant corroborating evidence to justify the search of the home." (Walton's Post-Hearing Supp. Br., ECF #24 at Pg. ID 421.)  This argument overstates the significance of the original tip.  That tip merely led officers to the Hopkins Residence; their observations and actions once they arrived at the residence (and afterwards) were the keys to establishing probable cause to search the residence.

_____

[8] It may be possible, as Walton implies, that if Judge Somers had found the stop of the maroon pick-up truck unlawful, he would have refused to consider evidence seized during the search of the truck.  But, as the government notes, it is not clear that the occupants of the Hopkins Residence would have had standing to object to the police conduct directed toward the driver of the truck, and it is possible that Judge Somers could have decided to issue the warrant and to leave questions concerning standing and the validity of the stop to the trial judge hearing the case against the occupants of the house.  The bottom line is that, on this record, one can only speculate as to what Judge Somers would have done if the Mack Affidavit had stated that State Trooper Robe conducted an investigatory drug stop on the maroon pick-up truck.

Moreover, the officers' observations and subsequent investigation served to corroborate the informant's tip (at least to some extent). The informant reported that the Ford Explorer was being used to sell drugs, and Detective Zinser saw that vehicle parked in the driveway of a home from which drugs were being sold. Under all of these circumstances, the addition to the Mack Affidavit of the fact that the informant was paid would not have undermined the probable cause established by the affidavit.

Finally, Walton argues that the Mack Affidavit would not have established probable cause if it had revealed that Louise Russell owned the Hopkins Residence. Walton insists that Russell's ownership of the home "separated any connection between the home and the investigation[']s observed illegalities." (*Id.* at Pg. ID 422.) But the fact that Russell owned the home would not have undermined the officers' observations – as reported in the Mack Affidavit – that an individual from the home sold drugs to another person in the driveway of the home. And that transaction, standing alone, was enough to establish probable cause to search the Hopkins Residence – no matter who owned it. *See Ellison,* 632 F.3d at 349. Thus, the Mack Affidavit would have established probable cause to search the residence even if the affidavit revealed that Russell owned the residence.

In sum, none of the additions to, or deletions from, the Mack Affidavit would have undermined the statements in that affidavit that were sufficient to establish probable cause to search the Hopkins Residence – *i.e.*, the report that officers

observed a drug transaction in the driveway of the residence involving an individual who left from, and returned to, the residence. Thus, there is no basis to suppress the evidence seized pursuant to the warrant issued by Judge Somers.

## III

For the reasons explained above, **IT IS HEREBY ORDERED** that Walton's Motion to Suppress (ECF #14) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: January 2, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 2, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764