UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                          Plaintiff,                 CR. NO.  16-20755

     v.

                                           HON. JUDITH E. LEVY

ASHANTI WALTON,

                          Defendant.

_____/

**<u>REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)</u>**

## I.      Introduction

Ashanti Walton, through counsel Nancy L. McGunn, submits this Reply brief in support of his *pro se* motion for compassionate release, ECF No. 72, and respectfully moves the Court, pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A)(i), to reduce his term of imprisonment to time served, and to impose a special condition of home confinement on supervised release.  This will allow him to serve the remainder of his sentence at home, which will protect him, the staff and inmates at FCI Milan, and the community from the spread of COVID-19.

Mr. Walton suffers from three serious medical conditions – Obesity, Type II Diabetes, and Ankylosing Spondylitis.  As a result, he is at "risk of severe illness" from COVID-19, according to CDC guidelines.  He has served approximately 45 months in custody – 75% of his 60-month sentence.   His current release date is March 4, 2021, leaving him with less than a year to serve.  Mr. Walton has participated in educational and employment-related programs at Milan, and has worked as a barber.  He has a solid release plan in place, including a residence and two confirmed job opportunities.

The Government does not concur in the relief sought.  Their Response concedes that Mr. Walton's heightened risk from COVID-19 based on a medical condition qualifies as an "extraordinary and compelling reason" for release under § 1B1.13(1)(A), yet maintains that because he is a danger to the community he is ineligible for release.

## II.   Legal Standard for Compassionate Release

The Government correctly sets forth the standard for compassionate release. Pursuant to 18 U.S.C. § 3582, district courts can grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and the Sentencing Commission's applicable policy statements—regardless of the BOP's position.

The parties agree – Mr. Walton's medical condition qualifies as an "extraordinary and compelling" reason to grant him relief.  R. 78, Gov't Response, p. 12.  It is important to note that the Government's Response addresses only one (Type II Diabetes) of Walton's three three medical conditions.  Undersigned counsel has provided additional information regarding Mr. Walton's health below, and his BOP medical records have been filed under seal as exhibits to this pleading.

The Government incorrectly claims that Mr. Walton must establish that he is not a danger to the community, pursuant to U.S.S.G. § 1B1.13.  Mr. Walton seeks release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which contains no requirement that he prove a lack of dangerousness.  Compare, 18 U.S.C. § 3582(c)(1)(A)(ii); See, United States v. Haywood, Cr. No. 14-20178, R. 176 at p. 4 (E.D. Mich. August 7, 2020)(Lawson, J.) Nevertheless, Mr. Walton recognizes that the safety of the community is a factor under 18 U.S.C. § 3553(a) that the Court must address in deciding whether release is appropriate, and so addresses dangerousness below.

2

### III.   The Bureau of Prisons Is Struggling To Manage the COVID-19 Crisis And Prisoners are Suffering As a Result.

"Jails and prison[s] are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment."

United States v. Skelos, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).

Incarcerated people "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[1]  And the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[2] As courts have recognized, there can be no doubt that "the COVID-19 virus spreads with uncommon and frightening speed in carceral settings." Skelos, 2020 WL 1847558, at *1.   Prison officials are powerless to reduce breathing, coughing, sneezing, or movement in the cramped, communal spaces of prisons.  In addition, since the start of the pandemic, reports have poured in about BOP's incompetence at every level, including non-existent education to inmates and correctional officers about the spread of the virus, dubious staffing decisions undermining the safe-keeping of quarantined

---

[1] *Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), https://perma.cc/KGP7-PDVJ.

[2] *See* Joseph A. Bick, *Infection Control in Jails and Prisons,* 45 Clinical Infectious Diseases1047, 1047–55 (2007), https://perma.cc/8N4Y-ZRJD; Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://perma.cc/94RG-QR5L.

inmates, and inadequate testing to confirm the number of cases. *See, e.g.*, Keri Blakinger & Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps,* The Marshall Project (June 18, 2020).[3]

Cases continue to grow because of the disease's very nature. The virus is wildly infectious. It survives "on surfaces for days." Mary Van Beusekom, *U.S. Studies Offer Clues to COVID-19 Swift Spread, Severity*, Cntr. for Infectious Disease Research & Policy (Mar. 18, 2020). The CDC advises that the virus spreads mainly "[b]etween people who are in close contact with one another (within about 6 feet)," and that "respiratory droplets produced when an infected person coughs, sneezes, *or talks* . . . can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs." CDC, *How COVID-19 Spreads*, http://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (June 16, 2020)(emphasis added).

To stem the spread of the disease, the Centers for Disease Control ("CDC") broadly advised people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer. *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others*, cdc.gov (Apr. 24, 2020), https://perma.cc/B5BA-TATF. These recommendations are impossible to follow in prisons where inmates are housed

---

[3]  Available here: https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps.

together in bunks or dormitories, and where staff moves daily between the prison and the outside community, transferring the virus from the community to the prison. A research letter published on July 8, 2020,  in the JAMA Network Journal, specifically addresses COVID-19 cases and deaths in prisons.  That letter states that the COVID-19 case rate for prisoners is "5.5 times higher" than the US population case rate, and that the adjusted death rate the prison population was "3.0 times higher than would be expected if the age and sex distribution of the U.S. and prison populations were equal." See, B. Saloner, PhD, et al, *COVID-19 Cases and deaths in Federal and State Prisons,* (July 8, 20), at: https://jamanetwork.com/journals/jama/fullarticle/2768249.

The Bureau of Prisons ("BOP") may have developed a protocol for dealing with the COVID-19 pandemic, but that protocol is no match for the COVID-19 virus.  On March 18, 2020, two BOP employees tested positive for the virus- the "first known cases of the virus in the federal prison system."[4]  Today, just over five months later, the number of cases within the BOP has exploded.  As of August 24, 2020, the numbers were:

**11,757 inmate cases (1,485 current and  10,272 "recovered")**
**1,497 staff cases (627 current and 870 "recovered")**
**116 inmate deaths; 1 staff member death**

---

[4] Available at: https://www.cnn.com/world/live-news/coronavirus-outbreak-03-18-20-intlhnk/h_a54cf26ba807b067b5118719ea785eb5.

See, *BOP COVID-19 Resource Page*, available at https://www.bop.gov/coronavirus/.
And those are only the cases that are actually known.  To date, BOP has completed
testing for 46, 353 inmates, which represents only 33**%** of the total inmate population.
Of those tested, over 25% have been positive.  Id.

Because of incomplete testing, the true rate of infection within BOP remains
unknown. The BOP's "figures do not accurately reflect the illness and the potential
problems associated with deadly virus spread in prison."[5]  At one BOP facility, the
president of the correctional officer's union estimated inmate infection at 600% of
BOP's public number.  *Elkton Union President Reports Different COVID-19 Stats than
Federal Bureau of Prisons*, WKBN News (Apr. 9, 2020)[6]. Several jails and prisons,

---

[5] Blakinger & Hamilton, *supra* ("[T]he truth is much worse than the BOP's official
numbers indicate."); Walter Pavlo, *Federal Judges Are Relying on Bureau of Prisons
COVID-19 Numbers To Make Rulings*, Forbes (May 20, 2020),
https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-
on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#6939c65012c7; *see also*
Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind
Bars*, N.Y. Times (Mar. 30, 2020),
https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also*
Walter Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes
(Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-
prisons-underreporting-outbreaks-in-prison/#4e9b13e87ba3; *United States v. Rodriguez*,
2020 U.S. Dist. LEXIS 58718, at *23 (E.D. Pa. Apr. 1, 2020) (explaining why "[t]he
BOP's [rapidly growing number of] reported cases . . . almost certainly
underestimate[s] the true number of infections"); United States v. West, No. 1:17-cr-
390-AT-1, Corrected Order (Redacted) at 4, ECF No. 53 (N.D. Ga. Mar. 30, 2020)
(recognizing the BOP's "incomplete reporting of COVID-19 cases").

[6] https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-
different-covid-19-stats-than-federal-bureau-of-prisons/

including BOP facilities, have already become COVID-19 hotspots and have faced sharp criticism, even lawsuits, over the handling of the virus.[7]

The ability of BOP personnel to stop the spread of the virus is in grave doubt. As an initial matter, there are the complications, outlined above, that exist in any carceral setting – inability to social distance, limited access to hygiene items, infrequent disinfection. These complications clearly exist at FCI Milan.  To begin with, the facility has a maximum capacity of 1,015 inmates, yet houses approximately 1,344.  *Compare* PREA Audit Report, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 18, 2019), https://www.bop.gov/locations/institutions/mil/MIL_prea.pdf, *with* FCI Milan, BOP.gov, https://www.bop.gov/locations/institutions/mil/ (August 24, 2020) ("Population: 1,344 Total Inmates").  Thus, under normal circumstances it appears that FCI Milan exceeds capacity for the number of inmates that it is safe and humane to house.

In the last several months, 3 inmates at FCI Milan have died of COVID-19.  The Bureau of Prisons reports that there is currently 1 positive case within the inmate population of Milan, and 91 inmates have "recovered."  See, https://www.bop.gov/coronavirus/.  It should be noted, however, that (as of August

---

[7] See, C. Johnson, *Lawsuit filed after COVID-19 Outbreaks at Terminal Island, Lompoc Federal Prisons*, (7/18/20), https://www.nbclosangeles.com/investigations/lawsuit-filed-against-terminal-island-prison-after-covid-19-outbreak/2364939/; Blakinger & Hamilton, *supra*.; K. Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, Washington Post (3/29/20)

24, 2020) of the 1,344 inmates at Milan, only 381 – about 28% - have completed COVID-19 tests.  Of those completed tests, 87 inmates (23%) have tested positive. Id. This suggests that the true number of inmates who are positive for the virus is likely much higher.  The threat of COVID-19 within FCI Milan is very real, and very terrifying.  The accurate number of "active" cases is not known due to inadequate testing.  Close living circumstances make the rapid spread of the virus inevitable and likely uncontrollable.  "This disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a lack of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of inmates and staff." United States v. Amarrah, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020).

Inmates must also deal with the renewed threat of infection that comes every day as guards and staff circulate through the prison complex and then return to the community.  They return to Milan, bringing with them the continuous risk and spread of coronavirus.  Randy Hall is a corrections officer at FCI Milan.  He became concerned that he had COVID-19 in early April, when he noticed he could not smell his meal. The next day he called in sick to the facility, and was tested in the community.  He learned the following day that he had tested positive, and called Milan to report the result.

When he called his office to report the result, though, they didn't seem to worry about the virus. They told him to return to work if he was fever-free for 72 hours, which he was because he never had a fever. Then they told him to return to work seven days after he started feeling the symptoms, which was two days prior. Then they told him to return to work if there was any improvement at all. There was no 14-day quarantine as recommended by the Centers for Disease Control and Prevention.

. . .

So far, 40 inmates and 50 staff members at FCI Milan have tested positive for coronavirus. Two inmates died. A month ago, one of Randy's colleagues helped take care of an inmate who had to be transported from the prison to a hospital. The colleague was not given PPE – he had requested a mask but was denied. He sat in the ER with the inmate, who later tested positive and died. The colleague contracted the virus and ended up on a ventilator himself.

"With their procedures, they kind of intensified the outbreak inside the prison. One, we didn't have PPE. Two, they didn't recognize my symptoms as COVID-19 symptoms, so they wanted me to come to work," said Randy, who is president of AFGE Local 1741.

See, *A BOP Officer Contracted Coronavirus.  He Was Told to Return to Work ASAP,* (May 4, 2020) American Federation of Government Employees ("AFGE") website, available at https://www.afge.org/article/a-bop-officer-contracted-coronavirus.-he-was-told-to-return-to-work-asap/.  Staff at other BOP facilities share these concerns.  See, Walter Pavlo "*As Bureau of Prisons Enters "Phase 9" of COVID-19 Plan, BOP Staff Wonder if There Is a Real Plan,"*, Forbes, August 7, 2020.[8]

---

[8] Available at: https://www.forbes.com/sites/walterpavlo/2020/08/07/as-bureau-of-prisons-enters-phase-9-of-covid-19-plan-bop-staff-wonder-if-there-is-a-real-plan/#30c24c8e326f

**IV.    Mr. Walton's Medical Conditions Qualify as "Extraordinary and Compelling Reasons" Warranting Release.**

As the BOP faces an escalating health crisis because of COVID-19, many courts, including in this district, are exercising their authority to grant release under § 3582(c)(1)(A)(i), to nonviolent inmates who are at risk of death or serious illness from COVID-19.  Release is consistent with the Sentencing Commission's policy statements for two reasons. First, Walton's current health condition and incarceration during this pandemic "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover." U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii);  see, United States v. Reddy, No. 13-CR-20358, 2020 WL 2320093, at *7; United States v. Amarrah, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) at *6.  He also presents "Other Reasons" under U.S.S.G. § 1B1.13, cmt. n. 1(D), warranting compassionate release, because while the COVID-19 pandemic is devastating in every region it invades, prison populations are subject to heightened vulnerability. See, Miller v. United States, No. CR 16-20222-1, 2020 WL 1814084 at *3 (E.D. Mich. Apr. 9, 2020).

**A. Anklosing Spondylitis**

Mr. Walton has suffered for years from stiffness and pain that he attributed to arthritis.  See, PSR ¶ 41. While at FCI Milan, he was treated for pain and eventually referred to the Rheumatology Department at the University of Michigan for evaluation.

<u>See</u>, Exhibit A, p. 90-96.[9] His diagnosis was Ankylosing Spondylitis, which is a type of arthritis that causes inflammation in parts of the spine.  <u>See</u>, Exhibit A, p. 6. Exhibit C, Summary of Ankylosing Spondylitis from <u>www.Spondylitis.org</u>.  Mr. Walton is currently treated with Adalimumab (otherwise known as Humira), a non-steroid injectable medication that reduces inflammation and thus pain.  Patients taking Humira are at greater risk for serious infections, as the medication can lower the ability of your immune system to fight infection.  <u>See</u>, <u>https://www.humira.com/covid19</u>.    Mr. Walton's use of Humira, in and of itself, may cause him to be at an increased risk for severe illness from COVID-19.    <u>See</u>, <u>https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions</u>.    When considered alongside Mr. Walton's other medical issues, detailed below, it clearly renders him extremely vulnerable to severe illness from COVID-19.

## B. Type II Diabetes

Mr. Walton was diagnosed with Type II Diabetes while incarcerated on this case.  <u>See</u> Exhibit A, p. 1.  His family has been devastated by this disease.  In 2009, Mr. Walton's father died as a result of a heart attack, brought on by complications of Type

---

[9]  The Government provided defense counsel with Mr. Walton's BOP medical records from 2019 and 2020.  Those records have been filed under seal with the Court as Exhibits A (2019 records) and Exhibit B (2020 records).  Defense counsel inserted page numbers in the lower right corner of the records to aid in identification and review.

II Diabetes.  At that time his father required dialysis in addition to insulin treatment.[10]
The PSR in this case indicates only that Mr. Walton's brother Jermaine was "disabled."
See, PSR ¶ 37.  Mr. Walton's sister, Rashida Walton, provided heartbreaking details
regarding Jermaine's condition.  She confirmed that Jermaine had lost an eye and
endured leg amputation, both a result of complications from Type II Diabetes.
Jermaine also progressed to needing dialysis, and in June 2020 he died as a result of a
blood infection.

Individuals suffering from Type II Diabetes Mellitus are at an increased risk of
severe illness from COVID-19.   See,  https://www.cdc.gov/coronavirus/2019-
ncov/need-extra-precautions/people-with-medical-conditions.   And the CDC has no
doubt about the strength of the science, saying the "strongest and most consistence
evidence" supports the ineluctable conclusion that diabetics are at extreme risk.[11]

Doctors conclude the same. Filed alongside this brief is an affidavit from Dr.
Stephen Edelman, M.D., a board-certified physician in diabetes and internal medicine who

---

[10]  Undersigned counsel was provided with this information by Rashida Walton, Mr.
Walton's sister.

[11] Center for Disease Control, *Coronavirus Disease 2019, Evidence used to update the list of
underlying medical conditions that increase a person's risk of severe illness from COVID-19* (July
28, 2020) (available at: https://bit.ly/2Pbs4AH) (citing S. Richardson, et al., *Presenting
Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-
19 in the New York City Area*, J. Am. Med. Assoc. (Apr. 22, 2020) (available at:
https://bit.ly/3auhLzS); B. Bode, M.D., et al., *Glycemic Characteristics and Clinical
Outcomes of COVID-19 Patients Hospitalized in the United States*, J.of Diabetes Science &
Tech. (2020) (available at: https://bit.ly/2PpsqUt)) (additional citations omitted).

currently serves as the director of the Diabetes Care Clinic at the VA Medical Center in San Diego, and who has served for nearly 20 years a professor at the University of San Diego, teaching about and studying diabetes.[12] Dr. Edelman has published over 200 research papers since 1985 and serves as a journal reviewer for no less than 10 medical publications, including the New England Journal of Medicine.[13] He minces no words when it comes to the dangers coronavirus poses: "[diabetics] held within correctional settings are particularly vulnerable as a result of their incarceration"[14]—they are both "more vulnerable to contracting COVID-19 as a result of reduced immunity derived from their type 2 diabetes" and "more likely to suffer serious and deadly consequences of COVID-19 . . . ."[15]

### C. Obesity

Counsel could not locate a weight calculation for Mr. Walton in his 2020 medical records. He reported a current weight of 220, while his weight in December of 2019 was 203 pounds. See, Exhibit A, p. 1. Using the height reported at that visit – 5 feet, 7 inches, Mr. Walton's Body Mass Index (BMI) in December of 2019 was 31.8, while currently (using the weight of 220 lbs), he appears to have a BMI of 34.5. See, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (BMI

---

[12] See, Exhibit D, Declaration of Dr. Stephen Edelman, CV of Dr. Edelman.

[13] Exhibit D, CV at p. 2, 30–34.

[14] Exhibit D, Edelman Decl. ¶ 7.

[15] *Id.* ¶ 11.

calculator).   Either of these figures places Mr. Walton in the "obesity" category, which applies to a BMI of 30 or higher.  Individuals suffering from Obesity are, according to the CDC, "at increased risk of severe illness" from COVID-19.  The Department of Justice has previously conceded that a BMI above 30 <u>alone</u> qualifies as an "extraordinary and compelling" reason for consideration of release.  <u>See</u>, Exhibit E, July 30, 2020 Letter in *United States v. Steven Cole*, Cr. 18-167 (D. Maryland).

### D. **COVID-19 Disproportionately Affects Males and African-Americans.**

The virus also disproportionately affects males and African Americans.[16]  Some studies have shown that "[t]he risk of men dying of COVID-19 is double that of women."  *See* Kashmira Gander, *Men Twice As Likely to Die Frim COVID-19 Than Women, Study of Chinese Coronavirus Patients Suggests*, Newsweek (Apr. 29, 2020), https://perma.cc/QUY9-XMZ6.

Further, the CDC recognizes that African American individuals are disproportionately affected by the COVID-19 pandemic.  CDC data shows that hospitalization and death rates of African American individuals are "5 times that of

---

[16] *See* Chris Mooney et al., *All Across the United States, the Coronavirus is Killing More Men than Women, Data Show,* Wash. Post (Apr. 4, 2020), https://perma.cc/V4QZ-RWG9; Reis Thebault et al., *The Coronavirus is Infecting and Killing Black Americans at an Alarmingly High Rate*, Wash. Post (Apr. 8, 2020), https://perma.cc/J23N-CS8A; Eleanor Cummins, *What We Know About Whom COVID Kills*, Slate (May 1, 2020), https://perma.cc/L3NU-2NTL; Akilah Johnson & Talia Buford, *Early Data Shows African Americans Have Contracted and Died of Coronavirus at an Alarming Rate*, ProPublica (Apr. 3, 2020), https://perma.cc/K4TG-2CF6.

non-Hispanic white persons."  CDC, *COVID-19 in Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (June 25, 2020).   The CDC recognizes that racial and ethnic minority groups are over-represented in jails, prisons, and detention centers, which have specific risks due to congregate living, shared food service, and more, and also notes that "[s]tigma and systemic inequalities may undermine prevention efforts, increase levels of chronic and toxic stress, and ultimately sustain health and health care disparities."  Id. The CDC specifically lists racial and ethnic minority groups as "people who need extra precautions" during this pandemic.  CDC, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (July 21, 2020) ("Long-standing systemic health and social inequities have put some members of racial and ethnic minority groups at increased risk of getting COVID-19 or experiencing severe illness, regardless of age.") (emphasis omitted).

### E. Mr. Walton's Prior COVID-19 Diagnosis Does Not Make Him Immune to the Virus.

In late June of this year, Mr. Walton tested positive for COVID-19.  He was placed in isolation and monitored for symptoms.  It does not appear that he was retested, or given an antibody test.  See, Exhibit B, p. 1- 26.   He was subsequently moved out of quarantine.  The fact Mr. Walton has already tested positive for COVID-19 does not guarantee he will not be re-infected, and once re-infected, will not suffer devastating consequences.

The death of Adam Solarzano, an inmate at FCI Terminal Island, followed less than one month after he was deemed "recovered" from COVID-19 by BOP doctors. Mr. Solarzano, like Mr. Walton, had pre-existing medical conditions. Like Mr. Walton, Mr. Solarzano was deemed "recovered" following quarantine and no presentation of active symptoms. Five days later, Mr. Solarzano was admitted to a local hospital suffering from chest pains and anxiety. COVID tests at the hospital yielded negative results. His condition declined, and nine days after he was admitted to the hospital Mr. Solarzano died.[17]

A number of courts, including this one, have released individuals who qualified for release <u>and</u> who had previously tested positive for COVID-19. <u>See</u> *United States v. Galka*, Cr. No. 16-20254, R. 108 (E.D. Mich. August 25, 2020); *United States v. Yellin*, 2020 WL 3488738 (S.D.Cal. June 26, 2020)(Records showing inmate had "recovered" from COVID-19 do not eliminate risk of reinfection); *Snell v. United States*, Cr. No. 16-20222-6 (E.D. Mich. Jun. 2, 2020); *United States v. McCall*, 2020 WL 2992197 Cr. No. 2:18-cr-00095, R. 96 (M.D. Ala. June 4, 2020.) (granting compassionate release to inmate who tested positive for COVID-19 and finding the "risk of reinfection" to be unacceptable); *United States v. Brown*, Cr. No. 18-cr-360, R. 35 (N.D. Ala. May 22, 2020) (granting compassionate release to COVID-19 positive inmate who also suffered from

---

[17]<u>See,</u>  https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf

asthma);; *United States v. Huntley*, Cr. No. 13-cr-119-ABJ, R. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19).

## V.     The Section 3553(a) Factors Weigh in Favor of Mr. Walton's Release And He is Not a Danger to the Community.

Mr. Walton has a supportive network of friends and family within the community.   Upon his release, he plans to live with his sister, Rashida Walton, who works as a social worker for the State of Michigan.  Rashida Walton lives in Dearborn Heights with her son (13 years old) and her daughter (10 years old), and has a bedroom ready for Mr. Walton.  Anticipating his possible need to quarantine upon release, Rasida Walton has indicated that she and her children will stay with her mother, (also Mr. Walton's mother), who lives nearby.   Both Rashida Walton and her mother have remained in close contact with Mr. Walton's children while Mr. Walton has been incarcerated.  See, PSR ¶ 38.  They have a good relationship with Louise Russell, the mother of Mr. Walton's children, and assist with childcare.

While incarcerated, Mr. Walton has taken steps to improve and position himself to avoid a return to crime.   He was a high school graduate prior to his conviction, and he expanded his education while at Milan through a variety of programs.  See, Exhibit F, Inmate Education Transcript.  Mr. Walton had a strong work history prior to his conviction, PSR  ¶ 52-56, and while at Milan he has been employed as a barber earning average and above average work evaluations.  See, Exhibit G, Progress Report

9/2/2019.  Upon his release, he has two solid job prospects.  Deion Benjamin, a former coworker at Kearns Roofing (PSR ¶ 55), is now a crew leader at the company and confirmed to undersigned counsel his intention to offer Mr. Walton a job upon his release.  Jason Azzopardi, a friend of Mr. Walton's and a manager at PPG Coating, called counsel to confirm his willingness to hire Mr. Walton as a hi-lo driver.  Mr. Azzopardi told counsel that he had actually been training Mr. Walton for that job around the time of his arrest in this case.

At the time of sentencing, Mr. Walton has several prior convictions, but only one – a 2000 Assault With Intent to Rob While Armed – that involved threatening or violent behavior.  See, PSR ¶ 26.  Mr. Walton 20 years old at the time of that offense.  The underlying offense in this case did not involve violent or threatening behavior, and Mr. Walton's institutional record confirms that he has not had serious issues while in custody.  On December 14, 2019, Mr. Walton was cited for being in an unauthorized area.  He lost the use of the e-mail system for 15 days. On March 4, 2020, Mr. Walton was cited for having a three-way conversation on the telephone.  He lost 27 days of good time credit, 60 days of access to commissary, and could not use the phone for 90 days.  See, Exhibit H, Inmate Discipline Data.

The Government is correct – possession of a firearm in furtherance of drug distribution is a very serious offense.  Yet the nature of Mr. Walton's conviction, by

itself, is not a bar to compassionate release.  Compassionate release has been granted in a number of cases where defendants had similar convictions.[18]

Further, supervision conditions can ensure Mr. Walton is not a danger. This Court can put safeguards in place to ensure the safety of the community if a person is released.  United States v. Al-Jumail, No. 12-20272, 2020 WL 2395224, at *5 (E.D. Mich. May 12, 2020).  Further, this Court may still recognize that the original sentence was "just" while concluding "that the threat posed by COVID-19, in light of Defendant's underlying health conditions, constitutes an 'extraordinary and compelling reason' to modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(I)."  United States v. Hunt, No. 18-20037, 2020 WL 2395222 at *6 (E.D. Mich. May 12, 2020).

---

[18] United States v. Haywood, Cr. No. 14-20178, R. 176 at p. 4 (E.D. Mich. August 7, 2020)(Lawson, J.)(granting CR for defendant convicted of felon in possession of a firearm and conspiracy to distribute drugs), United States v. Brown, 2:18-cr-00360-KOB-JEO, R. 35 (N.D. Ala. May 22, 2020) (granting CR of defendant convicted of use of a firearm in connection with drug trafficking); United States v. Parker, Case No. 2:98-cr-00749- CAS-1, 2020 WL 2572525, at *14 (C.D. Cal. May 21, 2020) (granting CR, despite defendant's leadership of a drug distribution network and fact that offense involved weapon); United States v. Almontes, No. 3:05-cr-58, 2020 WL 1812713, at *1 (D. Conn. Apr. 9, 2020) (granting CR of "career offender" defendant with drug and § 924(c) conviction"); United States v. Rodriguez, Cr. No. 2:03-cr- 00271, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting CR of defendant whose "criminal history involve[d] a series of convictions for drug dealing" and case involved firearms offenses); United States v. Peterson, No. 7:12-CR-15-IBO, R. 63 (E.D.N.C. June 4, 2019) (granting CR of defendant whose offenses included discharging a firearm in the furtherance of a drug trafficking offense).

Under <u>Pepper v. United States</u>, 562 U.S. 476, 490–93 (2011), the Court must consider post-offense developments under § 3553(a), which provide "the most up to-date picture" of the defendant's history and characteristics and "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." <u>Id.</u> at 492.  Mr. Walton accepts full responsibility for his prior mistakes and while incarcerated, has lived every day with the consequences of his actions.   While at Milan, he has taken classes and worked, all while maintaining relationships with those closest to him.  Mr. Walton is ready to comply with whatever conditions of community supervision this Court deems appropriate, including home confinement.

## VI.    Conclusion

Ashanti Walton respectfully requests compassionate release.  He asks that the Court reduce his term of imprisonment to a term of time-served, and permit him to begin his term of supervised release with an added condition that he be placed on home confinement.

Respectfully Submitted,

**FEDERAL DEFENDER OFFICE**

<u>s/ Nancy McGunn</u>
613 Abbott Street, 5th Floor
Detroit, Michigan  48226
313-967-5846
E-mail: nancy_mcgunn@fd.org
P55156

Date: August 25, 2020

<u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed this date using the CM/ECF system which will send notification to all parties of record.

<u>s/Jennifer Mellas</u>
Paralegal